IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Appellee,<br><br>vs.<br><br>NORMAN L. AKAU III,<br><br>Defendant-Appellant. | C.A. NO. 25-3092<br><br>D.C. NO. CR 19-00099-DKW-09<br>U.S. District Court, District of Hawaii,<br>Honolulu<br><br>MOTION FOR AN ORDER DISMISSING APPEAL AND MEMORANDUM IN SUPPORT OF MOTION; DECLARATION OF JONATHAN D. SLACK; EXHIBITS A–C; CERTIFICATE OF SERVICE |

UNITED STATES OF AMERICA'S MOTION FOR AN ORDER
DISMISSING APPEAL AND MEMORANDUM IN SUPPORT OF MOTION

KENNETH M. SORENSON
United States Attorney
District of Hawaii

JONATHAN D. SLACK
Assistant U.S. Attorney
Room 6-100, PJJK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii 96850
Telephone: (808) 541-2850
Email: Jonathan.Slack@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

I.    BACKGROUND ............................................................................2

II.   LEGAL STANDARD ..............................................................10

III.  ARGUMENT.............................................................................11

     A.   Akau Knowingly and Voluntarily Waived His Right to Appeal, and His Sentence Falls Within the Waiver............................11

     B.   The Government Did Not Breach the Plea Agreement.......................12

         1.   The plea and proffer agreements promised only that Akau's own statements would not be used directly against him.................................................................12

         2.   The government's pre-plea communications sustained, rather than enlarged, the scope of proffer protection. ....................................................................14

         3.   The government knew of the EC murder conspiracy before the proffer, and so it was independently established as relevant conduct. ...................................16

     C.   Akau's Due-Process Claim Was Waived Below and Is Meritless. ..............................................................................17

     D.   Akau's Section 5K1.1 Challenge Is Foreclosed by His Appellate Waiver and Fails on the Merits............................19

IV.  Conclusion ..............................................................................20

## UNITED STATES OF AMERICA'S MOTION FOR AN ORDER DISMISSING APPEAL AND MEMORANDUM IN SUPPORT OF MOTION

The United States of America, by and through its undersigned attorneys, submits this motion and supporting memorandum for an order dismissing the instant appeal by Appellant Norman L. Akau III, pursuant to Federal Rule of Appellate Procedure 27 and Ninth Circuit Rules 27-8.1,[1] 27-9.2. The government asks this Court to dismiss this appeal because Akau validly waived his appellate rights.

In his brief, Akau does not dispute that he knowingly and voluntarily entered a plea agreement with an appellate waiver. He instead argues that the government breached the agreement, thus voiding his appellate waiver, by (1) urging the district court to calculate his offense level based on a murder-for-hire conspiracy, (2) withholding allegedly derivative evidence before the guilty plea, and (3) recommending a one-level downward departure under U.S.S.G. § 5K1.1. Akau is mistaken on all three grounds. The agreements in this case immunized only the direct use of his statements and expressly granted the government the right to use evidence derived from Akau's statements. The government honored that agreement throughout the prosecution. Because the government did not breach the plea agreement, the appellate waiver is enforceable, and it bars Akau's merits challenges to his within-Guideline sentence. His appeal should be dismissed.

---

[1] The government agrees with the bail status stated on page 1 of the opening brief. The government previously obtained an extension to file its responsive brief.

## I.  BACKGROUND

This prosecution arose from the investigation into Michael Miske, Jr.'s racketeering organization on Oahu.  *See* PSR-16–17.  On June 18, 2020, a twenty-two-count superseding indictment charged Miske, Akau, and nine others with crimes related to the organization.  Akau was charged in five counts: racketeering conspiracy, drug trafficking conspiracy, carrying or using a firearm in relation to the drug conspiracy, robbery, and brandishing a firearm in relation to the robbery.  PSR-12.

On March 10, 2021, Akau entered a written proffer agreement with the government under advice of counsel.  Exhibit A, pp. 179–83 (submitted under seal).  In paragraph 6 of that agreement, Akau authorized derivative use of his statements and waived any taint hearing under *Kastigar v. United States*, 406 U.S. 441 (1972):

> 6. Derivative Use: The government may make derivative use of, and may pursue investigative leads suggested by, any statements or information provided during your client's proffer. Evidence obtained as a result may be used for any purpose. This means that **should your client provide information during the proffer that leads to the discovery of other evidence against your client, that evidence may be used in any subsequent** prosecution and **sentencing of your client**. This provision is necessary to eliminate the necessity of a *Kastigar* hearing in which the government would have to prove that the evidence it seeks to introduce at trial or in a related legal proceeding is derived from a "legitimate source wholly independent" of statements or information from the proffer.

ExA-181 (emphases added).  Three paragraphs below, in paragraph 9 of the proffer agreement, the agreement further discussed sentencing protection:  "Pursuant to

U.S.S.G. § 1B1.8, information proffered by [Akau] may not be used by the Court in determining the applicable guideline range." ExA-181.

During a March 2021 proffer, Akau described his role in a conspiracy regarding victim "EC" and proffered the following to the government, *see* ExA-16–17, OB-25:

**Fact 1.** The conspiracy against EC was coordinated by co-defendant Wayne Miller.

**Fact 2.** Miller believed that, if the conspiracy succeeded, it would earn him favor with Miske.

**Fact 3.** The conspiracy was for a "hit" (murder).

**Fact 4.** Whoever executed the hit would be paid (although the payer was not specified).

**Fact 5.** In one attempt under the conspiracy, Akau was moments away from shooting EC but was called off by Miller.

The government was aware of at least Facts 1 through 4 before Akau's March 2021 proffer. **Fact 1** was initially suggested to the government by a cooperator ("Cooperator 1"). In August 2018, Cooperator 1 described how Miske directed Miller to stalk EC. ExA-102. In October 2018, Cooperator 1 fully disclosed **Fact 1** to the government. Cooperator 1 described how Miske tasked Miller with stalking and assaulting EC, and how Miller then directed others to help with the assault of EC, who lived in the "Honda Building." ExA-122. In that same disclosure, Cooperator 1 suggested **Fact 2** by describing how Miske wanted EC out of the way so Miske could gain more control over longshore jobs. *Id.*

3

**Fact 2** was fully disclosed by a different cooperator ("Cooperator 2") in October 2018. Cooperator 2 described how Miller was "desperate to get the job right" concerning the individual living in the "Honda Building" because Miller wanted "back into the good graces of Miske." ExA-106–07. Cooperator 2 also described how Akau admitted to helping Miller stalk that individual (EC). *Id.*

**Fact 3** was disclosed by Cooperator 1 during grand jury testimony in June 2019. Under oath, Cooperator 1 described the conspiracy against EC as being directed by Miske to be, at times, going to "third base," but at other times, a "home run." ExA-174–75. Cooperator 1 explained how "third base" was a baseball euphemism used by Miske to mean actions like "shake 'em up, put him in the hospital, . . . burn 'em, run 'em over. . . . Just cripple 'em." *Id.* "Home run" meant "fully take him out." *See id.* On June 18, 2020, the government presented a summary exhibit to the grand jury in aid of the superseding indictment returned that same day. A portion of the presentation summarized the evidence of **Fact 3**, "Attempted Murders and Murder Conspiracies," as racketeering acts. The presentation listed Akau and others as participating in attempted-murder and murder conspiracies at Miske's direction, including the EC plot. ExA-167–68.

**Fact 4** was known to the government by at least June 3, 2019. In a search warrant affidavit bearing that date, an FBI agent swore that Miske directed several "contract assaults," including for "an individual who lived in the 'Honda Building,'"

4

i.e., EC. ExA-149–50. Further, in the June 2020 grand jury session, the government's summary presentation described Miske as enlisting Miller to be a "hitman 'broker.'" ExA-168.

On June 9, 2021, Akau pleaded guilty to the racketeering-conspiracy count pursuant to a plea agreement. PSR-13. In exchange for the guilty plea, the government agreed to move to dismiss the remaining counts pending against Akau and not to file additional charges for attempted murder or for any murder-for-hire scheme. ER-278. Had Akau been convicted of the dismissed counts, he would have faced a combined mandatory-minimum sentence of 22 years of imprisonment: a 10-year minimum on Count 16 under 21 U.S.C. § 841(b)(1)(A), a consecutive 5-year minimum on Count 17 under 18 U.S.C. § 924(c)(1)(A)(i), and a consecutive 7-year minimum on Count 19 under 18 U.S.C. § 924(c)(1)(A)(ii). *See* ER-324–28.

Two cooperation provisions in Akau's plea agreement are relevant to this motion. Paragraph 24 provides, "[a]part from any written proffer agreements, if applicable, this Agreement supersedes all prior promises, agreements or conditions between the parties." ER-296. Paragraph 21.e provides that, "[p]ursuant to Section 1B1.8(a) of the Sentencing Guidelines, the prosecution agrees that self-incriminating 'information provided pursuant to this Agreement to cooperate will not be used in determining the applicable guideline range, except as may be provided in this Agreement and under Section 1B1.8(b) of the Sentencing Guidelines.'" ER-295.

5

The plea agreement also contains an appellate waiver, ER-287–88:

13. The defendant is aware that he has the right to appeal his conviction and the sentence imposed. The defendant knowingly and voluntarily waives the right to appeal, except as indicated in subparagraph "b" below, his conviction and any sentence within the Guidelines range as determined by the Court at the time of sentencing, . . . or the manner in which the sentence . . . was determined, on any ground whatsoever, in exchange for the concessions made by the prosecution in this Agreement. The defendant understands that this waiver includes the right to assert any and all legally waivable claims.

a. [Paragraph covering collateral attacks].

b. [Paragraph allowing appeals of above-Guideline sentences].

At the change of plea hearing, Akau confirmed under oath that he had read and understood the agreement, and the government summarized its terms, including the appellate waiver. ER-223–44. When doing so, the government described how the plea agreement "supersede[d] all prior promises, agreements or conditions between the parties" "[a]part from any written proffer agreements." ER-243. Akau's counsel raised the issue of proffer protection to the district court: "[T]here was a confirmation between [government] counsel and I that [Akau's] proffer statements would not be used against him at sentencing[.]" ER-230. Counsel elaborated further, "we discovered later on, after we discussed sort of a side letter we had, that the plea agreement did provide in paragraph 21E, sort of the same thing." The district court asked the government to clarify. The government responded by reading verbatim from paragraph 21.e and noting that the factual-

6

stipulations section (paragraph 8) included some of Akau's "admissions" "made under proffer," which should not be used against him at sentencing. ER-230–31.

The factual basis for Akau's guilty plea covered **Facts 1–5**. ER-257–58; ER-282–83. The factual basis also went beyond those facts. In both his written stipulations and verbal statements, Akau admitted that he knew the EC hit involved more than Miske's mere anticipated approval—Miske ordered the hit before it was attempted. *See* ER-257 ("Mr. Akau, while being directed by Wayne Miller, accepted an offer from Miske to murder [EC]."). The district court questioned Akau about who was supposed to pay the $50,000 reward, asking him whether "Miller told you" that "[Miller] was going to get it from [Miske?]. Akau answered, "Yes, Your Honor." The court sharpened the question: "Mr. Miske would be paying the $50,000 to you for your help?" Akau answered, "Yes, Your Honor." ER-264–65.

Akau continued to cooperate after his guilty plea and, on April 8, 2024, testified at Miske's trial. Akau's trial testimony contradicted his sworn plea-colloquy admissions. He testified that the $50,000 offer for murdering EC came from Miller acting on his own and that Miske had nothing to do with EC or another murder-for-hire conspiracy. ER-107; ER-102–03. When asked why Akau believed the EC conspiracy was "Miller's thing," Akau testified that he "asked [Miller] if it had anything to do with [Miske], and he told me no." ER-107.

The trial evidence otherwise showed that Miske directed the EC murder-for-hire conspiracy. That evidence included the testimony of Wayne Miller, Exhibit B,[2] and Jacob Smith, Exhibit C. *See also* PSR-18. Harry Kauhi also testified about Akau being the triggerman for an attempted hit against EC (**Fact 5**). ExA-49–51.

On July 18, 2024, a petit jury convicted Miske on most of the charged counts. PSR-7–8. The jury's verdict form indicates that it did not find beyond a reasonable doubt that Miske was responsible for the murder-for-hire conspiracy against EC. *See* ER-427–28 (breaking down the verdict's racketeering acts).

For Akau's sentencing, the PSR grouped his racketeering conduct into three acts: robbery (adjusted offense level 26), methamphetamine distribution (adjusted offense level 28), and the EC murder-for-hire conspiracy (adjusted offense level 37). PSR-20–21. Because the murder-for-hire conspiracy produced the highest offense level, it was the anchor for the multiple-count analysis. PSR-22. The result was a total offense level of 34, after acceptance of responsibility, with a Guideline range of 188–235 months of imprisonment. PSR-22; PSR-29. Akau objected to the inclusion of the EC murder conspiracy as relevant conduct, arguing that the plea agreement and the government's promises precluded it. Specifically, Akau argued

---

[2] "Q: Did Mr. Miske's wishes ever change in regard to [EC]? A: Yeah, he would go back and forth because — because it was taking long. . . . So sometimes he would be like — he would be like, Hey, fuck 'em, just get rid of this fucker already. That's what he used to tell me. Q: What did that mean to you? A: Kill 'em."

that the § 1B1.8 protection in paragraph 21.e of plea agreement superseded any grant of derivative use in the proffer agreement. As a result, he sought a corrected offense level of 25 instead of 34. PSR-36.

The government supported the PSR's calculation by explaining that it possessed independent evidence of the murder conspiracy and Akau's involvement therein, e.g., Kauhi's and Miller's testimony. The government specifically argued that it possessed such evidence prior to Akau's proffer. The government also argued that its communications with defense counsel were consistent with the proffer and the plea agreement, that the plea agreement's cooperation provision did not supersede the proffer agreement (which carved out derivative-use immunity), and that Akau was not granted sentencing immunity for the EC murder plot writ large. PSR-36–37. A few days after those responses, the government moved under § 5K1.1 for a one-level downward departure for substantial assistance. ER-420.

At sentencing, the district court overruled Akau's objections and adopted a total offense level 34, finding that § 1B1.8 did not bar consideration of the EC murder conspiracy because the government knew of that offense before the proffer and, alternatively, the written agreements permitted derivative use. ER-19–21. The court granted the § 5K1.1 motion to the extent of one level, resulting in a suggested custodial term between 168 and 210 months, and sentenced Akau to 168 months of

9

custody. ER-46–48. The district court entered judgment on May 6, 2025, and Akau filed a timely notice of appeal on May 14, 2025. OB-1.

## II. LEGAL STANDARD

This Court has jurisdiction over an appeal despite an appellate waiver but ordinarily will *not* review the merits of the appeal if the waiver is valid. *United States v. Torres*, 828 F.3d 1113, 1124 (9th Cir. 2016). When interpreting a plea agreement, including an appellate waiver, this Court looks to principles of contract law. *Id.* If the appellate waiver covers the grounds raised on appeal, and if the waiver was made knowingly and voluntarily, the waiver will be enforced. *Id.*

"A waiver of the right to appeal does not bar a defendant from challenging an illegal sentence." *United States v. Wells*, 29 F.4th 580, 584 (9th Cir. 2022). An illegal sentence is one not authorized by statute or the judgment of conviction, or one that violates the Constitution. *Id.* (citing *United States v. Bibler*, 495 F.3d 621, 624 (9th Cir. 2007)). An appellate waiver poses no bar if (1) the defendant raises a challenge that the sentence violates the Constitution, (2) the challenge is directly to the sentence itself, and (3) the challenge is not based on any underlying constitutional right that was expressly and specifically waived by the appeal waiver as part of the plea agreement. *Wells*, 29 F.4th at 587. Because Akau's waiver-avoidance argument is that the government breached the plea agreement, this Court "first determine[s] whether the government breached the plea agreement before turning to [the] appellate

10

waiver." *United States v. Plancarte*, 136 F.4th 975, 979 n.2 (9th Cir. 2025) (finding

no breach, enforcing waiver, and dismissing appeal).

## III. ARGUMENT

**A.      Akau Knowingly and Voluntarily Waived His Right to Appeal, and His Sentence Falls Within the Waiver.**

Akau does not argue that his entry into the plea agreement and appellate

waiver was unknowing or involuntary. Nor does he allege any violation of Rule 11

of the Federal Rules of Criminal Procedure. Those points are not in play. *See United*

*States v. Nunez*, 223 F.3d 956, 958–59 (9th Cir. 2000) (citing *United States v. Doe*,

170 F.3d 1162, 1166 n.3 (9th Cir. 1999) (finding waiver of argument)).

In paragraph 13 of the plea agreement, Akau waived the right to appeal his

conviction and any sentence within the Guideline range as determined by the court

at the time of sentencing, "on any ground whatsoever." The district court determined

a Guideline range of 168–210 months of imprisonment and imposed a sentence at

the bottom of that range, 168 months. The 168-month sentence is authorized by

statute and the judgment of conviction, and Akau raises no constitutional challenge

that directly attacks the sentence itself on a right not waived. Accordingly, no

exception applies under *Wells*. *See* 29 F.4th at 587. Akau's appellate waiver thus

bars his appeal unless he can show a breach of the plea agreement. He cannot, for

the reasons provided below.

**B.     The Government Did Not Breach the Plea Agreement.**

>    ***1.     The plea and proffer agreements promised only that Akau's own statements would not be used directly against him.***

Plea agreements are construed under contract principles.  *Torres*, 828 F.3d at 1124.  The plea agreement in this case incorporates the prior proffer agreement.  That is the only reasonable interpretation of the merger/integration clause at paragraph 24 of the plea agreement, which specifies that the written plea agreement "supersedes all prior promises, agreements or conditions between the parties" "[a]part from any written proffer agreements."  *See In re Holl*, 925 F.3d 1076, 1084 (9th Cir. 2019) (discussing incorporation by reference).  Read together, the plea and proffer agreements limited Akau's proffer immunity to direct-use immunity.

For the proffer agreement:  Paragraph 6 of that agreement expressly grants the government the right to use evidence derived from Akau's proffer statements.  Paragraph 6 also inheres the self-evident right for the government to use independent evidence, even if that evidence proved the same facts that Akau proffered.  *See* ExA-181.  And paragraph 6 waives any *Kastigar* hearing for taint analysis, specifying that derivative evidence can be "used in any subsequent . . . sentencing."

Only a few paragraphs below, paragraph 9 references protection under § 1B1.8.  Section 1B1.8 is said to provide full use immunity, *see United States v. Joiner*, 183 F.3d 635, 641 (7th Cir. 1999), and use immunity ordinarily implies derivative-use immunity "unless . . . [the agreement] expressly clarifie[s] that only direct use

immunity was offered," *United States v. Plummer*, 941 F.2d 799, 805 (9th Cir. 1991). Here, the § 1B1.8 protection in paragraph 9 must be limited to direct-use immunity— it cannot grant derivative-use immunity—because of the express exclusion of derivative-use immunity in paragraph 6. *Cf. Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 279 (9th Cir. 1992) (noting that a specific contract provision ordinarily qualifies the meaning of a general provision (citing Restatement of Contracts § 236(c) (1932))). Akau appears to concede this point. *See* OB-30 ("While the proffer agreement meets this standard [in *Plummer*], . . .").

The same interpretive conclusion must apply to the § 1B1.8 language in paragraph 21.e of the plea agreement. That is so because, again, the plea agreement cannot be read without the proffer agreement. *See Holl*, 925 F.3d at 1084. As the government explained at the plea hearing, and as the plea agreement states, the written plea agreement superseded all prior agreements "[a]part from any written proffer agreements." The same interpretive principle that harmonizes the proffer agreement's § 1B1.8 language with its derivative-use clause, therefore, also harmonizes the plea agreement's § 1B1.8 language.[3] Furthermore, both paragraph 21.e and § 1B1.8

---

[3] The district court likewise concluded that, given paragraph 24 in the plea agreement, there was "continued viability of the defendant's proffer agreement which includes the derivative use clause." ER-21. The case cited by Akau, *United States v. Baird*, 218 F.3d 221 (3d Cir. 2000), is distinguishable because the agreements there did not include a derivative-use clause.

13

recognize exceptions to cooperation protection when the parties' agreement so provides and under the scenarios listed in § 1B1.8(b), e.g., "the use of information . . . known to the government prior to entering into the cooperation agreement." Both exceptions apply here; the latter is discussed below. *See* discussion *infra* Part III.B.3.

### 2. *The government's pre-plea communications sustained, rather than enlarged, the scope of proffer protection.*

The government's plea-hearing statements and pre-hearing emails sustained, rather than enlarged, the scope of Akau's proffer immunity. The government's April 23, 2021, email described how the "information" Akau revealed "under proffer" should not be considered at sentencing. OB-17. That statement tracks the proffer agreement, which uses the terms "statements" and "information" as equivalents[4] and which protects against "direct use" of Akau's "truthful statements and information." ExA-180. The June 7, 2021, email is likewise consistent with the written agreements. That email disclaimed any "side agreement" and grounded "proffer protection" in the "standard plea agreement language." That email also confirmed the government would address counsel's concern at the plea hearing. OB-18.

The government did so by describing paragraph 21.e on the record, specifically the § 1B1.8 language, and how that language specified, "the defendant's admissions

---

[4] A defendant can proffer "information" without making a "statement," e.g., by having counsel communicate a fact on his or her behalf. In that scenario, the proffer protection prohibits the government from asserting the proffered fact while citing counsel as the source, just as if the defendant had stated the same during the proffer.

made under proffer may not be used against him in any way in determining his sentence, relevant conduct, and so forth." ER-241. Notably, that description of protection was tied to Akau's "admissions" made under proffer, not the topic of his admissions or any evidence derived from them. Put differently, what was protected was the fact that Akau communicated certain facts to the government, nothing more. *See* Black's Law Dictionary (12th ed. 2024) (defining "admission" as a "statement in which someone admits that something is true or that he or she has done something wrong"). The district court made the same, reasoned conclusion. *See* ER-21.

As more of a practical point, Akau argues that his plea bargain is "meaningless and valueless" if the EC murder conspiracy is not charged but counted as relevant conduct anyway, suggesting the parties could not have intended such a result during plea negotiations. *See* OB-36. Akau's account of the bargain is mistaken. In consideration for Akau's guilty plea, the government agreed not to charge Akau with attempted murder or any murder-for-hire scheme *in addition* to dismissing four counts pending against him in the superseding indictment. Had Akau been convicted of just three of those dismissed counts—none of which related to the EC murder conspiracy—Akau would have faced a combined mandatory-minimum custodial sentence of 22 years (264 months), well beyond both his Guideline range and the 168-month sentence imposed below. *See* ER-324–28. Further, as provided in the plea agreement, Akau was given a fantastic opportunity to cooperate with authorities

15

in a way that could have resulted in a more significant downward departure motion. Akau squandered that opportunity, however, by backtracking on his testimony regarding Miske's involvement in the EC murder conspiracy.

### 3. The government knew of the EC murder conspiracy before the proffer, and so it was independently established as relevant conduct.

The record shows that the government knew of the EC murder-for-hire conspiracy before Akau's March 2021 proffer. The Background section to this motion, above, sets out a detailed timeline. *See also* ER-20 (district court finding). In summary, beginning in 2018, two cooperators informed the government that Miske directed Miller to stalk and assault EC, that Miller was motivated by a desire to regain Miske's favor, and that Akau assisted in the stalking. In 2019, a cooperator testified that the plan involved escalating levels of violence, including discussions of murder.[5] By mid-2019, the government had evidence that the conspiracy included paid assaults against EC. These facts were later incorporated into a 2020 grand jury presentation identifying attempted-murder and murder conspiracies—including one against EC—as involving Miske, Miller, Akau, and others. The government thus knew of the EC murder conspiracy, not merely an assault conspiracy, before Akau's proffer. Given that timing, the government's evidence establishing the EC murder-

---

[5] An agreement alternating between beating and killing someone is enough for a conspiracy to kill. *See Salinas v. United States*, 522 U.S. 52 (1997) ("There is no requirement of some overt act or specific act in [18 U.S.C. § 1962(d)].").

16

for-hire conspiracy was both independent of Akau's proffer statements and well within the "known" "prior to" exception defined in § 1B1.8(b)(1).

Even assuming the government's evidence of the EC murder conspiracy was derivative of Akau's proffer statements—which the government does not concede—that would still not establish a breach. The proffer agreement expressly authorized the government to make derivative use of Akau's statements. Akau's argument thus fails on its own terms. He does not argue that the testimony and statements of other witnesses were insufficient to establish the EC murder conspiracy by a preponderance of the evidence. Rather, he argues that the district court should not have considered that conduct at all and that the supporting evidence was traceable to his proffer. *See* OB-32–34. The written agreements and timeline of the government's investigation foreclose that theory, as explained above. The government was permitted to use derivative evidence, and the district court could rely on it to calculate Akau's offense level. Thus, whether the evidence was independent of Akau's proffer, derivative of it, or both, the government did not breach the plea agreement by supporting the PSR's calculation of Akau's offense level based on the EC murder conspiracy.

## C. Akau's Due-Process Claim Was Waived Below and Is Meritless.

Akau argues that the government violated "due process" by not disclosing inculpatory, allegedly derivative evidence before his guilty plea. *See* OB-35–39. Akau did not present this claim below, and so it is waived on appeal. *See United*

17

*States v. Robertson*, 52 F.3d 789, 791 (9th Cir. 1994) ("Issues not presented to the district court cannot generally be raised for the first time on appeal.").

Even if not waived, Akau's claim fails on the merits for three reasons. **First**, Akau's claim does not fit into the *Wells* exceptions to an appellate waiver. He does not assert that his sentence exceeded statutory authority. And although his claim is of a constitutional flavor, it does not challenge the sentence itself (but rather, the government's conduct). **Second**, the government is not required to disclose inculpatory trial-witness statements before a guilty plea. If Akau were right, the government would have needed to turn over reports of cooperator statements, a grand jury transcript, and a search warrant affidavit before his guilty plea. Those materials are statements of witnesses on which the government would have relied if Akau elected to go to trial. The disclosure of such statements is governed by the Jencks Act, 18 U.S.C. § 3500, which prohibits forced disclosure before trial. *Id.* § 3500(a).[6] Moreover, the government is not required to disclose inculpatory evidence before a guilty plea as a matter of due process. *See Koshkaryan v. McEwen*, 2014 WL 879699, at \*5 (C.D. Cal. Feb. 26, 2014) ("[T]he Supreme Court has not held that the prosecution has a duty to disclose evidence which is inculpatory or unfavorable to the accused." (citing *United States v. Bagley*, 473 U.S. 667, 675

---

[6] The timing specified by the Jencks Act supersedes the timing for other discovery laws, including *Brady*. *See United States v. Jones*, 612 F.2d 453, 455 (9th Cir. 1979).

(1985)); *cf. United States v. Ruiz*, 536 U.S. 622, 633 (2002). And **third**, before the plea hearing, the government did produce to Akau some of its independent evidence regarding the EC murder conspiracy.[7]

## D. Akau's Section 5K1.1 Challenge Is Foreclosed by His Appellate Waiver and Fails on the Merits.

Lastly, Akau claims that the government's one-level downward departure recommendation under § 5K1.1 was made in bad faith and breached the plea agreement. OB-40–48. That claim is, however, barred by Akau's appellate waiver, which waived his right to appeal "on any ground whatsoever" except for an above-Guideline sentence. Nothing in the plea agreement gave Akau the right to a particular § 5K1.1 recommendation. To the contrary, both the proffer and plea agreement reserved the § 5K1.1 decision to the prosecutor's discretion. ER-295–96; ExA-180.

Akau's claim also fails on the merits. The government did file a § 5K1.1 motion, and its one-level recommendation was grounded in the record. The principal reason for the limited recommendation was that Akau testified at Miske's trial contrary to his sworn change-of-plea admissions. At the plea hearing, Akau agreed that "Mr. Miske would be paying the $50,000 to you for your help" in the EC hit. At trial, however, Akau testified that he asked Miller whether the EC plot had anything

---

[7] The government can prove disclosure through a September 4, 2020, discovery transmittal signed by Akau's prior counsel. Because Akau did not raise his due-process claim below, the dispositive documents and transmittal were not filed; the government can provide them if the Court deems inspection necessary.

to do with Miske and Miller said no. The government reasonably viewed that testimony as backtracking that exculpated Miske on the EC murder-for-hire theory.[8]

Akau's cited "bad faith" cases involved the government's refusal to file a § 5K1.1 motion altogether, allegedly for unconstitutional reasons. *See United States v. Mikaelian*, 168 F.3d 380, 385 (9th Cir. 1999); *United States v. Burrows*, 36 F.3d 875, 884 (9th Cir. 1994). This case is different. The government filed a § 5K1.1 motion, explained its reasoning, and made a one-level *recommendation*—leaving the extent of any departure up to the district court. Akau was free to ask for a greater departure, and he did, but he was unable to convince the court that a greater departure was warranted. The court, in fact, found Akau's backtracking "more than a failure to cooperate with the government[;] it was an attempt to undermine the government's prosecution." ER-46–47. "[He] should be thrilled to get anything of value for what he did." ER-47. There can be no bad faith by the government under those facts.

## IV. CONCLUSION

For those reasons, Akau's appellate waiver bars all grounds that he raises in his opening brief. This Court should dismiss Akau's appeal. If the Court disagrees, even partially, the United States requests that the Court dismiss the waived portions

///

---

[8] The district court agreed, finding Akau's trial testimony "a surprise, maybe even a shock." ER-46. "Mr. Akau took the stand in the government's case in chief and said precisely the opposite [of his change-of-plea admissions]." *Id.*

Akau's appeal and reset the briefing schedule for any remaining issue(s).

DATED:  June 22, 2026, at Honolulu, Hawaii.

KENNETH M. SORENSON
United States Attorney
District of Hawaii

By: */s/ Jonathan D. Slack*
  JONATHAN D. SLACK
  Assistant U.S. Attorney

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | C.A. NO. 25-3092 |
| Plaintiff-Appellee, | D.C. NO. CR 19-00099-DKW-09 |
| | U.S. District Court, District of Hawaii, Honolulu |
| vs. | |
| NORMAN L. AKAU III, | DECLARATION OF JONATHAN D. SLACK |
| Defendant-Appellant. | |

## **DECLARATION OF JONATHAN D. SLACK**

JONATHAN D. SLACK declares as follows:

1.  I am an Assistant United States Attorney in the District of Hawaii and represent the government in this appeal.  The motion related to this declaration is approximately 5,017 words, excluding the caption page, table of contents, signature lines, and date line.

2.  I have conferred with two colleagues who handled this case in the district court.  As a result, I have become familiar with the pleadings filed to date, some of which are described in the ensuing paragraphs.

3.  Exhibit A to this declaration is a *placeholder* for a true and accurate copy of the "United States of America's Amended Response to Defendant Norman Akau's Sentencing Statement; Exhibits A-K," filed under seal in the district court at ECF No.

1867. The government intends to separately file Exhibit A under seal pursuant to Ninth Circuit Rules 27-13(c)–(d). The redactions in Exhibit A are from the original copy filed in the district court. Rule 27-13(d) specifies that a motion to seal a submitted document is not required for "an original, revised, or amended presentence report, its attachments, and any confidential sentencing memoranda." Exhibit A qualifies under that quoted language because it is a "sentencing memorandum," specifically, a filing relating exclusively to the facts and conclusions in the presentence report. *See* Dist. Haw. CrimLR32.2(a)(1) (defining "Sentencing Statement" to be a "formal objection to the draft Presentence Report"). Per District of Hawaii Criminal Local Rule 5.2(a), both Presentence Investigation Reports and Sentencing Statements are filed under seal automatically. Further, Exhibit A contains a partial grand jury transcript, and Ninth Circuit Rule 27-13(d) excepts from the motion-to-seal requirement any "Grand Jury Transcripts." On June 22, 2026, I was advised via a Ninth Circuit Operations email inquiry that Exhibit A should be submitted under seal as a pre-sentence report document.

4. Exhibit B to this declaration is an excerpt of a true and correct copy of the certified transcript of the January 31, 2024 (Day 15) jury trial proceedings before Chief United States District Judge Derrick K. Watson in *United States v. Miske et al.*, 19-cr-00099-DKW. Exhibit B is a partial transcript of the examination of Wayne Miller.

2

5. Exhibit C to this declaration is an excerpt of a true and correct copy of the certified transcript of the April 11, 2024 (Day 48) jury trial proceedings before Chief United States District Judge Derrick K. Watson in *United States v. Miske et al.*, 19-cr-00099-DKW. Exhibit C is a partial transcript of the examination of Jacob Smith.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: June 22, 2026, at Honolulu, Hawaii.

/s/ *Jonathan D. Slack*
JONATHAN D. SLACK
Assistant U.S. Attorney

# UNITED STATES OF AMERICA,

## Plaintiff-Appellee,

## vs.

# NORMAN L. AKAU III,

## Defendant-Appellant.

C.A. NO. 25-3092

Placeholder for Exhibit A

(Submitted Separately Under Seal)

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

UNITED STATES OF AMERICA,   )       CRIMINAL NO. 19-00099-DKW
                            )
            Plaintiff,      )       Honolulu, Hawaii
                            )
       vs.                  )       January 31, 2024
                            )
MICHAEL J. MISKE, JR.,      )
                            )
            Defendant.      )
_____ )

TRANSCRIPT OF JURY TRIAL (DAY 15)
BEFORE THE HONORABLE DERRICK K. WATSON,
CHIEF UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:          MARK INCIONG, ESQ.
                            MICHAEL DAVID NAMMAR, ESQ
                            WILLIAM KE AUPUNI AKINA, ESQ.
                            Office of the United States Attorney
                            PJKK Federal Building
                            300 Ala Moana Boulevard, Suite 6100
                            Honolulu, Hawaii  96850

For the Defendant:          LYNN E. PANAGAKOS, ESQ.
                            841 Bishop St., Ste 2201
                            Honolulu, HI 96813

                            MICHAEL JEROME KENNEDY, ESQ.
                            Law Offices of Michael Jerome
                            Kennedy, PLLC
                            333 Flint Street
                            Reno, NV 89501

Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
                            United States District Court
                            300 Ala Moana Boulevard
                            Honolulu, Hawaii 96850

Proceedings recorded by machine shorthand, transcript produced
with computer-aided transcription (CAT).

2

                            I N D E X

GOVERNMENT WITNESSES:                                    PAGE NO.


  WAYNE MILLER (CONTINUED EXAMINATION)

        RESUMED DIRECT EXAMINATION BY MR. INCIONG        4


EXHIBITS:                                                PAGE NO.

  Exhibit 1-52 was received in evidence                  15
  Exhibit 1-32 was received in evidence                  16
  Exhibit 1-0551 was received in evidence                26
  Exhibit 1-0033 was received in evidence                29
  Exhibit 2-23 was received in evidence                  33
  Exhibit 2-24 was received in evidence                  35
  Exhibit 2-101 was received in evidence                 40
  Exhibit 1-0001 was received in evidence                72
  Exhibit 1-0002 was received in evidence                72
  Exhibit 1-0010 was received in evidence                75
  Exhibit 1-0015 was received in evidence                77
  Exhibit 1-0016 was received in evidence                78
  Exhibit 1-0017 was received in evidence                79
  Exhibit 1-0018 was received in evidence                80
  Exhibit 1-0020 was received in evidence                82
  Exhibit 1-0021 was received in evidence                83
  Exhibit 1-0021-A was received in evidence              87
  Exhibit 1-0037 was received in evidence                92
  Exhibit 1-0061 was received in evidence                94
  Exhibit 1-0012 was received in evidence                96
  Exhibit 1-022 was received in evidence                 98
  Exhibit 1-0023 was received in evidence                99
  Exhibit 1-0024 was received in evidence                100
  Exhibit 1-0025 was received in evidence                101
  Exhibit 1-0026 was received in evidence                102
  Exhibit 1-0028 was received in evidence                104
  Exhibit 1-0029 was received in evidence                105
  Exhibit 1-0011 was received in evidence                109
  Exhibit 1-0034 was received in evidence                128
  Exhibit 1-0655 was received in evidence                132
  Exhibit 1-0067 was received in evidence                139
  Exhibit 5-23 and 5-23-A were received in evidence      184
  Exhibit 5-26 was received in evidence                  189

A    Yes.

MR. INCIONG:  Your Honor, that's all I have on this photo.

THE COURT:  All right.  So let's go ahead then and take our first break of the day.

As we do so, I'll remind our jurors to please refrain from discussing the substance of this case with anyone, including each other, until I advise you otherwise; to refrain from accessing any media or other accounts of this case that may be out there; and finally, please do not conduct any independent investigation into the facts, circumstances or persons involved.

So we'll try to keep it to about a 15- or 20-minute break, and then we will continue with the direct examination of Mr. Miller.

(Proceedings were recessed at 10:16 a.m. to 10:42 a.m.)

THE COURT:  All.  Right back from our first break of the day.

Mr. Inciong, you may resume when you're ready.

MR. INCIONG:  Thank you, Your Honor.

BY MR. INCIONG:

Q    Mr. Miller, before we proceed, I want to go back and ask a follow-up question on one thing you've testified already to.

Going back to the day when Mr. Miske came to your

85

apartment and -- and told you it was done.  Do you remember that?  Yes?

A    Yes.

Q    So I believe you testified something to the effect that he was throwing it in your face.

A    Yes.

Q    What did you mean by that?

A    Like throwing it in my face like the fact that -- that everything he did for me, and when I needed 'em, I wasn't there.  You know, I wasn't -- I wasn't there for him.

Q    Did you feel guilty when he told you that?

A    Yes.

Q    Why?

A    I mean that was my -- that was my closest -- like I said, when you said father or braddah, you know, that was my -- my friend.  When I say all of the above, that was -- that's how I felt about him, you know.  My whole life.

Q    Did that guilt stay with you?

A    Yes.  I mean --

Q    To this day?

A    Right up to this day.

Q    So when he started to ask you to follow people such as Elgin Calles, A1 --

A    Yeah.

Q    -- did you feel obligated in any way to do that?

86

A    Yes.

Q    Did you feel like you owed him?

A    Yes.

Q    Why?

A    I don't know how to explain it, Mark.  You know, I felt like -- I felt like -- I said before, anything he said couldn't be -- in my head wasn't wrong, Your Honor.  I would try find a way to make it right, even if it was wrong.  You know.

So -- yeah, he was -- like he was a -- he was a close friend, he did whatever I asked him to do.  You know, when I was in prison, we stayed in contact.  He --

Q    Were you hoping to repair your relationship by doing things like following A1, Elgin?

A    Yes.

Q    What did you hope to get back to?

A    Well, when he was telling me, Just get something done already, you know, like I felt like I needed to -- I felt like I needed to do what he said.

Q    All right.  Let me have you look -- this is going to be the last photo in this particular series -- at Exhibit 1-21-A.

Do you recognize what's shown there?

A    Yes.

Q    How do you recognize that?

A    This is the street going -- going into where -- where I said earlier that we was parked right there.  Yeah.  And this

87

is the street that turns in right there.

Q   Okay.  So this is the street -- a view of the street that leads to that back entrance to Capitol Place?

A   Yes.

Q   Does this photo accurately show that area as it appeared when you were watching that location?

A   Yes.

MR. INCIONG:  Your Honor, I would move to admit Exhibit 1-21-A.

THE COURT:  Any objection?

MR. KENNEDY:  No objection.

THE COURT:  Without objection, 1-21-Alpha is admitted. You may publish.

(Exhibit 1-0021-A was received in evidence.)

MR. INCIONG:  Thank you, Your Honor.

BY MR. INCIONG:

Q   So describe, if you could, and show the jury where the back entrance or the entrance you entered into was on this corner?

A   Yeah, the back -- the entrance was right there.  The part we showed earlier where I used to park used to be right down this street right here.  It's the road turning in right here. And sometimes if you look right here in this area, get one -- get one little parking section right there.

So when -- after I knew all his patterns and stuff

88

like that, I started bringing guys with me. We used to park right there, because from right here, park right there, you can see the front exit and the back exit right there. So you could see -- and this was both one-ways, so if you came out here, he had to drive past us over here, and if he went right there, came out right there, we could see him come out right there, and then leave and immediately we would go straight over there.

Q   Okay.  Thank you.

MR. INCIONG:  We can take that down then for the moment, Your Honor.

BY MR. INCIONG:

Q   So you just mentioned -- you said you knew his pattern or learned his pattern.  What did you mean by that?

A   I knew -- by that time I knew where he used to go, where he used to work, what time he used to work, when he used to go to the gym, where he used to park.

Q   And you are referring to A1?

A   A1, yeah.  Yeah, where his mom used to -- another house that he used to go to, Papakolea.

Q   So were you using a combination of actually following him yourself in a vehicle as well as using this tracking device?

A   Yes.

Q   Were you giving reports periodically to Mr. Miske?

A   Yes.

Q   What would he -- how would he respond?

89

A   Oh, he would give me some feedback, like he would tell me, Hey, I think he drink at -- at these bars.  I think stuff like that.  Yeah.

Q   Approximately how long did you follow A1 Elgin for?

A   For a while.  I don't -- I don't know how -- I cannot give one exact date.  Long time.

Q   Weeks, months?

A   Months, yeah.

Q   Did Mr. Miske ever tell you with any sort of specificity what he wanted done to A1?

A   Well, it was weird on this one because at first he was like -- he was like, Hey, just -- this one just at the most, third base 'em, you know.

Q   "Third base" meant what again?

A   Put 'em in the hospital, fuck 'em up.  You know, just fuck him up bad.  Real bad.  You know what I mean.  Not -- so he get the message.  Not to kill 'em.  You know, that's what he told me.  At that time he was just like take -- take the tight end. He used to refer to Jake as the tight end.

Q   Tight end, what did that mean?

A   Like somebody that not going hit a home run, somebody that not going to kill somebody, but just can shake somebody up real bad, beat them up real bad, put them in the hospital.  Yeah.

Q   Did you know Jake Smith?

A   Yes.

Q     What did you know about Jake Smith?

A     He was -- he was a young kid going around -- he remind me of myself a little bit, he used to go around, he was robbing people, yeah.

Q     Did he have any sort of reputation for -- for violence or assaults?

A     Yes.

Q     What was that?

A     Yeah, he used -- he used to rob people.  Always had -- always had guns on him.  Used to bang people up.  Yeah.

Q     "Bang people up" mean beat people up?

A     Yeah.  Yes.

Q     Did you know whether he was trained in any martial art?

A     Yeah, his dad -- his dad owned like one -- his dad owned like one kickboxing gym or something like that, a martial arts gym.

Q     Okay.  Now, you mentioned that you used to bring some guys with you once had established the patterns.  Is that what you said?

A     Yes.

Q     Was Jake Smith one of these guys?

A     Yes.  Jake -- Jake Smith was a -- so when he was -- when he was telling me he just -- just no go farther than third base, you know, put this fucker in the hospital.  That's what he used to tell me.  Then that's when Jake started coming at

those times.

Q   Did Mr. Miske's wishes ever change in regard to A1?

A   Yeah, he would go back and forth because -- because it was taking long.  This guy, he never went to like -- to like isolated places.  And he always parked like where it always had people and stuff like that.  So sometimes he would be like -- he would be like, Hey, fuck 'em, just get rid of this fucker already.  That's what he used to tell me.

Q   What did that mean to you?

A   Kill 'em.

Q   Did you talk to additional people about doing that for you?

A   Yes.

Q   Who did you ask about that?

A   Oh, I talked -- I talked to my cousin Norm, Norman Akau.  I talked to -- Harry Boy came with us.  Yeah.

Q   Harry Boy is who?

A   Kauhi.

Q   Harry Kauhi?

A   Yes.

Q   Okay.  Let me have you look at Exhibit 1-37, please.

        Do you recognize that?

A   Yes.

Q   Who is that?

A   Miske.

Q   Is this the person that you have previously identified in court as the defendant?

A   Yes.

MR. INCIONG:  Your Honor, I would move to admit Exhibit 1-37.

MR. KENNEDY:  No objection, Your Honor.

THE COURT:  Without objection, 1-37 is admitted.  You can publish.

(Exhibit 1-0037 was received in evidence.)

MR. INCIONG:  Your Honor, may I use the face board for this next section of the testimony, please?

THE COURT:  What do you mean?

MR. INCIONG:  I mean start displaying this photo along with some subsequent ones on the face board.

THE COURT:  As long as they're faces that have been admitted into evidence.

MR. INCIONG:  Yes.

THE COURT:  Yes.

MR. INCIONG:  Yes, of course.

BY MR. INCIONG:

Q   So Mr. Miske was the one who told you about A1, correct?

A   Yes.

Q   Now, you mentioned Norman Akau.

MR. INCIONG:  Could I have Exhibit 1-33 that's previously been admitted into evidence?

93

BY MR. INCIONG:

Q    That's -- that's your cousin Norman Akau?

A    Yes.

Q    And you talked to him about actually carrying out a full hit on -- on A1?

A    Yes.

Q    Harry Kauhi is another name that you mentioned, correct?

A    Yes.

MR. INCIONG:  Could I show Mr. Miller Exhibit 1-61 at this time?

THE COURT:  Yes.

BY MR. INCIONG:

Q    Do you recognize who's shown in that photograph?

A    Yes.

Q    How do you recognize that?

A    That's Harry -- Harry Boy Kauhi.

Q    How do you know him?

A    Oh, I know him since I was young too.

Q    Does this photo accurately show Mr. Kauhi as he appeared about that time you were following A1?

A    Yes.

MR. INCIONG:  Your Honor, I would move to admit Exhibit 1-61.

THE COURT:  Any objection?

MR. KENNEDY:  No objection.

204

COURT REPORTER'S CERTIFICATE

I, Gloria T. Bediamol, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing is a complete, true, and correct transcript from the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at Honolulu, Hawaii, March 29, 2024.


/s/ Gloria T. Bediamol
GLORIA T. BEDIAMOL.
RMR, CRR, FCRR

ExB-13

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

UNITED STATES OF AMERICA,    )    CRIMINAL NO. 19-00099-DKW
                             )
            Plaintiff,       )    Honolulu, Hawaii
                             )
      vs.                    )    April 11, 2024
                             )
MICHAEL J. MISKE, JR.,       )
                             )
            Defendant.       )
_____ )


TRANSCRIPT OF JURY TRIAL (DAY 48)
BEFORE THE HONORABLE DERRICK K. WATSON,
CHIEF UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:          MARK INCIONG, ESQ.
                            MICHAEL DAVID NAMMAR, ESQ
                            WILLIAM KE AUPUNI AKINA, ESQ.
                            AISLINN AFFINITO, ESQ.
                            Office of the United States Attorney
                            PJKK Federal Building
                            300 Ala Moana Boulevard, Suite 6100
                            Honolulu, Hawaii  96850

For the Defendant:          LYNN E. PANAGAKOS, ESQ.
                            841 Bishop St., Ste 2201
                            Honolulu, HI 96813

                            MICHAEL JEROME KENNEDY, ESQ.
                            Law Offices of Michael Jerome
                            Kennedy, PLLC
                            333 Flint Street
                            Reno, NV 89501

Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
                            United States District Court
                            300 Ala Moana Boulevard
                            Honolulu, Hawaii 96850

Proceedings recorded by machine shorthand, transcript produced
with computer-aided transcription (CAT).

2

                    I N D E X

GOVERNMENT WITNESS:                              PAGE NO.

 JACOB SMITH

        DIRECT EXAMINATION BY MR. NAMMAR              4


EXHIBITS:                                        PAGE NO.

 Exhibit 1-898 was received in evidence              21
 Exhibit 1-905B was received in evidence             47
 Exhibit 1-905 was received in evidence              49
 Exhibit 1-905C was received in evidence             50
 Exhibit 1-905D was received in evidence             51
 Exhibit 8-3 was received in evidence                72
 Exhibit 1-55 was received in evidence               76
 Exhibit 1-530 was received in evidence              78
 Exhibit 1-905A, 1-905E, 1-905J, and 1-905K were     83
 received in evidence
 Exhibit 3-1 was received in evidence                92
 Exhibit 1-764 was received in evidence             104
 Exhibit 1-498 was received in evidence             120
 Exhibit 1-494 was received in evidence             122
 Exhibit 1-503 was received in evidence             123
 Exhibit 1-510 was received in evidence             127
 Exhibit 1-922 was received in evidence             130
 Exhibit 1-709 was received in evidence             132
 Exhibit 1-919 was received in evidence             135
 Exhibit 1-944 was received in evidence             142
 Exhibit 1-908 was received in evidence             152
 Exhibit 1-909 was received in evidence             154
 Exhibit 1-910 was received in evidence             156
 Exhibit 1-912 was received in evidence             159
 Exhibit 1-914 was received in evidence             165
 Exhibit 1-915 was received in evidence             178
 Exhibit 1-918 was received in evidence             181
 Exhibit 1-927 was received in evidence             184
 Exhibit 1-928 was received in evidence             185
 Exhibit 1-929 was received in evidence             186
 Exhibit 1-933 was received in evidence             191
 Exhibit 1-934 was received in evidence             194
 Exhibit 1-936 was received in evidence             196
 Exhibit 1-942 was received in evidence             197

145

A    Yes.

Q    When you had contact with law enforcement, would you reach out to Mr. Miske about things like that?

A    Yes.

Q    Why would you do that?

A    Because I felt like he had resources to figure out what was going on.

Q    We can take that down.  In the 2016 and '17 time frame, were you also tasked to do something with Elgin Calles?

A    Yes.

Q    What were you tasked to do?

A    We were just supposed to assault him.

Q    You were supposed to assault him?

A    Yes.

Q    Who gave you that?

A    Miller.

Q    Did you ever talk to Mr. Miske about Elgin?

A    He has asked about if I thought that they were really going to get it done, because he's with multiple people, not just me.

Q    Sorry, I didn't catch that.

     Could you put the mic a little closer?

A    He asked me if I thought it was going to get done because Miller went with multiple people, not just me, on multiple different occasions.

146

Q So he is asking you for an update?

A Yes.

Q And who was Elgin, if you know?

A I wasn't sure at the time. I just knew he had something to do with stevedores or something like that.

Q Can you tell the jury what the stevedores is?

A The stevedores were dock workers. They were good jobs.

Q And did you know whether in the past Mr. Miske had gotten any people jobs there?

A I've heard he has, but I didn't know.

Q Do you end up following Elgin around?

A Yes.

Q With who?

A Me and Miller.

Q And what kind of vehicle do you recall being in with Miller?

A I don't recall but we were in an SUV.

Q When you were in that SUV, do you recall -- when you were following Elgin around, do you recall Mr. Miller having a phone conversation?

A Yes.

Q Could you recognize the other person on the end of that call's voice?

A Yes.

Q Who did you recognize that to be?

147

A    Mike.

Q    And what were the two talking about?

A    I'm listening to Miller.  He was letting him know that it wasn't done yet.

Q    What wasn't done?

A    That Elgin -- nothing happened to Elgin.

Q    So they were discussing the assault of Elgin?

A    Yes.

Q    Do you remember a particular time in the Kapahulu area of Honolulu with Elgin?

A    Yes.

Q    What do you recall?

A    We seen him stop at a restaurant in the Kapahulu area.  We were supposed to jump out and do it right there, but Miller told us to come back.

Q    Who was we?

A    Me and Miller was going to get out and do it, and I don't know if it was Norman with us or somebody else.

Q    So Miller told you not to do it?

A    Yes.

Q    Were you ready to do it?

A    Yes.

Q    Were you ever made aware that there was a tracking device on Elgin's vehicle?

A    Yes.

ExC-5

148

Q   How were you made aware of that?

A   Because Miller was following it.

Q   And how did that device work, if you know?

A   He had the tracker underneath Elgin's car, and I think he was using a burner.

Q   Did you see him at times using the burner phone with the app on it?

A   Yes.

Q   To track Elgin?

A   Yes.

Q   Do you remember at one point being at a golf course and doing anything with that tracker?

A   Yes.

Q   What do you recall doing?

A   We were at the golf course and he jumped out to grab the tracker.

Q   Who did?

A   Miller.

Q   Which golf course?

A   The golf course -- the military golf course across from FDC Honolulu.

        MR. NAMMAR:  Your Honor, could we publish 1-15 from the original list?

        THE COURT:  Go ahead.

BY MR. NAMMAR:

149

Q    Mr. Smith, 1-15 is up.

Do you recognize this building?

A    Yes.

Q    Did you do anything with respect to Elgin at this building?

A    We followed him into the parking garage.

Q    Why did you do that?

A    Because Miller was following him all day.  We were trying to assault him.

Q    What relation to this building did you understand Elgin to have?

A    I understood Elgin lived there.

Q    We can take that down.

Also in the 2016 -- around the 2016 time frame, did Mr. Miske talk to you about a Daniel Miller?

A    Yes.

Q    What did he tell you about a Daniel Miller?

A    He just told me that there was a -- Daniel Miller was another club owner and they didn't really like each other. Something happened at the club with his cousin.

Q    Who was -- who did you understand to be Miller's cousin?

A    Galmichi.

Q    So Miske told you he didn't like Daniel Miller.

Did he ask you to do anything with respect to Daniel Miller who was Galmichi's cousin?

ExC-7

200

COURT REPORTER'S CERTIFICATE

I, Gloria T. Bediamol, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing is a complete, true, and correct transcript from the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at Honolulu, Hawaii, May 28, 2024.

                              /s/ Gloria T. Bediamol
                              GLORIA T. BEDIAMOL.
                              RMR, CRR, FCRR

ExC-8